**CLOVERLEAF ENTERPRISES, INC., Appellant–Respondent,**

v.

**CENTAUR ROSECROFT, LLC, Appellee–Petitioner.**

No. 49A02–0402–CV–185.

Court of Appeals of Indiana.

Sept. 29, 2004.

Rehearing Denied Nov. 23, 2004.

Peter J. Rusthoven, Michael Rosiello, Joseph C. Chapelle, Barnes & Thornburg LLP, Indianapolis, IN, Attorneys for Appellant.

Geoffrey Slaughter, Debra McVicker Lynch, Sommer Barnard Ackerson, PC, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAILEY, Judge.

### Case Summary

Appellant–Respondent Cloverleaf Enterprises, Incorporated ("Cloverleaf") appeals the trial court's grant of an anti-suit injunction, without the issuance of a bond, in favor of Appellee–Petitioner Centaur Rosecroft, LLC ("Centaur"). Pursuant to the anti-suit injunction, Cloverleaf is precluded from prosecuting a case that it filed in a Maryland court of law, which involves similar parties and issues to the one at bar. We reverse under principles of judicial restraint and comity.[1]

### Issue

Cloverleaf raises four issues, the following one of which we find dispositive: Whether the trial court abused its discretion by granting the anti-suit injunction by, first, prohibiting Cloverleaf—i.e., a Maryland corporation—from pursuing an action, which involves Maryland citizens, Maryland law, and the sale of Maryland real estate, in a Maryland court of law and, second, granting the injunction absent a showing: (1) of irreparable harm; (2) that Centaur has a reasonable likelihood of success on the merits; (3) that the threatened injury outweighed the potential harm to Cloverleaf resulting from the granting of an injunction; and (4) that the public interest would not be disserved.[2]

### Facts and Procedural History

The specific controversy at issue here concerns the propriety of a trial court's order enjoining parties, over whom it has personal jurisdiction, from pursuing similar litigation in a sister state. To better understand the complex proceedings in this case, an overview of the underlying dispute and ensuing litigation is helpful.

### I. Background

This multi-jurisdictional suit resulted from an alleged breach of an asset purchase agreement ("Agreement") executed on January 17, 2003, between Centaur, a Maryland limited liability company,[3] and

---

1. We hereby deny Cloverleaf's motion for oral argument.

2. Cloverleaf also contends that the trial court erred by failing to require Centaur to post a preliminary injunction bond. However, because of our resolution of the first issue, we do not address this issue.

3. Centaur was created as a Maryland entity in connection with the transaction at issue in this case. Centaur's parent corporation is Centaur, Inc., which is an Indiana Sub-S corporation. In its appellee's brief, Centaur argues that *its* principal place of business is located in Indianapolis. However, our review of the evidence reveals that it is Centaur's parent corporation, not Centaur, which maintains a principal place of business in Indiana and that Centaur is "organized under the laws of the State of Maryland" but that the "controlling members of the limited liability companies that control [Centaur] are citizens of Indiana." Appellee's App. at 29.

Cloverleaf, a Maryland corporation. Pursuant to the Agreement, Centaur agreed to buy the "Rosecroft Raceway"—i.e., a racetrack located in Ft. Washington, Maryland—from Cloverleaf in exchange for $10,000,000.00. The Agreement, which is governed by Maryland law, contains the following provisions:

> 3.3 *Termination*
>
> > (a) If the Closing does not occur on or before the First Closing Date because as of the First Closing Date there is a Pending Challenge, this Agreement shall continue in full force and effect until the Second Closing Date. If the Closing does not occur on or before the Second Closing Date because as of the Second Closing Date there is a Pending Challenge, this Agreement shall automatically terminate on the day immediately following the Second Closing Date. . . .
>
> > \* \* \* \* \*
>
> > (c) If the Closing does not occur on or before the First Closing Date for any reason other than as described in *Sections 3.3(a)* or *(b)* above, this Agreement shall automatically terminate on the day immediately following the First Closing date.

Appellant's App. at 134. The Agreement defines the "First Closing Date" as "the earlier of (i) ten (10) days after receipt by [Centaur] of Regulatory Approval (or such other date as the parties shall mutually

agree), and (ii) November 1, 2003." *Id.* at 123. The "Second Closing Date" is defined as "the earlier of (i) the date any Pending Challenge preventing the Closing from occurring on or before the First Closing Date becomes fully resolved and non-appealable, and (ii) November 1, 2008." *Id.* at 128. Further, the Agreement defines a "Pending Challenge" as "any pending litigation or filed administrative action that could adversely affect the ability of [Centaur] to obtain Regulatory Approval."[4] *Id.* at 127.

On January 17, 2003, Centaur filed an application with the Maryland Racing Commission ("Commission") to obtain a racing license. On September 22, 2003, and October 27, 2003, Centaur filed two additional administrative actions with the Commission regarding increasing the number of live race days at Rosecroft Raceway and obtaining free market simulcasting. To date, none of these administrative actions have been resolved.

### II. Commencement of the Indiana and Maryland Actions

■ On October 27, 2003, Centaur filed the present declaratory action against Cloverleaf seeking a determination as to whether the Agreement remains in full force and effect (hereinafter referred to as the "Indiana Action"). At issue was whether Cloverleaf may retain a $2,500,000.00 deposit that Centaur made to it to secure purchase of the racetrack and whether the Agreement terminated as a result of Centaur's failure to close on or

---

4. Article 8, Section 8.8, which governs Centaur's conditions precedent, provides as follows:

*Permits and Licenses.* [Centaur] shall have received (a) Regulatory Approval, and (b) such other Permits as are necessary to allow [Centaur] to operate the Racetrack from and after the closing.

The failure of any of the foregoing conditions precedent of [Centaur] shall not enti-

tle [Centaur] to a refund of the Deposits, or any portion thereof. Notwithstanding the immediately preceding sentence, or anything to the contrary herein contained, [Centaur] shall not be limited or restricted from fully pursuing the remedies available to [Centaur] in *Section 3.3* and *Article 11* below.

Appellant's App. at 161.

before November 1, 2003. On October 30, 2003, Cloverleaf moved to dismiss the Indiana Action for lack of personal jurisdiction and on grounds of *forum non conveniens.*[5] Before the Indiana Action was resolved, on November 24, 2003, Cloverleaf filed a similar declaratory action in the Maryland Circuit Court (hereinafter referred to as the "Maryland Action"). In the Maryland Action, Cloverleaf moved for an aggressive trial schedule and immediate resolution of the litigation. In response, Centaur moved to dismiss the Maryland Action on the principle of comity for the Indiana Action, which the Maryland trial court denied. The Maryland court also scheduled a trial on the merits for March 1, 2004.

Meanwhile, on January 23, 2004, the Indiana trial court denied Cloverleaf's motion to dismiss, finding that it had personal jurisdiction over Cloverleaf and that the Indiana Action should not be dismissed on the basis of *forum non conveniens.*[6] On January 29, 2004, Centaur filed—in the Indiana Action—a motion to enjoin Cloverleaf from prosecuting the Maryland Action. On February 6, 2004, Centaur filed a verified motion for temporary restraining order prohibiting Cloverleaf from prosecuting the Maryland Action, which the Indiana trial court granted on February 11, 2004.

On February 12, 2004, the administrative judge of the Maryland trial court sent a letter to the Indiana trial court, via facsimile, which provides, in pertinent part:

> The purpose of this letter is to advise you that your order of February 11, 2004 is null and void as far as its legal effect over proceedings in a Maryland court of general jurisdiction. Maybe you have good reason for staying the proceedings in your jurisdiction, but the reasons are not articulated in your memorandum opinion. Therefore, I have instructed [the presiding judge] to proceed with whatever hearing, conference, or anything else she has scheduled in the case.

*Id.* at 195. In response, on February 12, 2004, the Indiana trial court sent the following communication to the Maryland trial court:

> . . . I would submit to you that a careful reading of my February 11, 2004 order would inform you that the Temporary Restraining Order was directed to the parties in the Indiana [Action,] and not to the Maryland Court or to Maryland attorneys.

*Id.* at 197.

On February 17, 2004, the Maryland trial court notified the parties in the Maryland action that the Indiana order has no jurisdiction in Maryland and, thus, it expected the parties to be present at the upcoming Maryland hearing. Also on that date, Cloverleaf filed its pretrial statement and designation of rebuttal expert in the Maryland Action, in violation of the

---

5. The Latin translation of *forum non conveniens* is "an unsuitable court." BLACK'S LAW DICTIONARY 665 (7th ed 1999). *Forum non conveniens* is the doctrine that an appropriate forum—even though competent under the law—may divest itself of jurisdiction if, for the convenience of the litigants and the witnesses, it appears that the action should proceed in another forum in which the action might originally have been brought. *Id.; see also* Ind. Trial Rule 4.4(C), (D) and (E).

6. Although the Indiana Action involves Maryland litigants, Maryland real estate, Maryland law, and the Maryland Racing Commission, the Indiana trial court found that it has general and specific personal jurisdiction over Cloverleaf. Apparently, Cloverleaf did not appeal this determination, nor did it appeal the trial court's denial of Cloverleaf's motion to dismiss on the basis of *forum non conveniens.*

Indiana temporary restraining order. On February 18, 2004, the Indiana trial court scheduled a hearing on Centaur's petition to hold Cloverleaf in civil contempt for violating the temporary restraining order, which has since been deferred.

On February 20, 2004, the Indiana trial court conducted a hearing on Centaur's motion for preliminary injunction. Five days later, the Indiana trial court granted Centaur's motion for preliminary injunction, enjoining Cloverleaf from participating in the Maryland Action. Subsequently, the trial court clarified that the injunction order enjoins Cloverleaf *and* Centaur from taking any affirmative action against the other party in the Maryland Action.[7] This appeal by Cloverleaf ensued.

## Discussion and Decision

### I. Anti–Suit Injunction

On appeal, Cloverleaf argues that the trial court's grant of the anti-suit injunction at issue, which enjoined it from pursuing the Maryland Action, constituted an abuse of discretion. The issue regarding whether an Indiana trial court has the discretion to enjoin non-citizen parties, over whom it has jurisdiction, from litigating a similar issue in a sister court—and, if so, the extent to which such discretion should be exercised—appears to be a novel issue in Indiana. In *Pitcairn v. Drummond*, 216 Ind. 54, 56, 23 N.E.2d 21, 22 (1939), our supreme court recognized that "the courts of this state have power to restrain citizens of this state, or other persons within the control of their process, from the prosecution of suits in other states or in foreign countries, when the prosecution of such suits in such jurisdictions is contrary to equity and good con-

science." *See also Kern v. Cleveland, C., C. & St. L. Ry. Co.*, 204 Ind. 595, 598–600, 185 N.E. 446, 447 (1933).

Some years later, in *Abney v. Abney*, 176 Ind.App. 22, 374 N.E.2d 264 (1978), *cert. denied*, 439 U.S. 1069, 99 S.Ct. 836, 59 L.Ed.2d 34 (1979), another panel of this Court—which was confronted with the inverse procedural posture to the case at bar—addressed the propriety of an anti-suit injunction and held that Indiana courts were not required, under the doctrines of comity or full faith and credit, to refrain from exercising jurisdiction over the plaintiff's petition despite the fact that a Tennessee court had enjoined the plaintiff from maintaining a divorce action in Indiana. *Id.* at 30, 374 N.E.2d at 269. There, the wife filed for and obtained a separate maintenance decree from a Tennessee probate court. *Id.* at 24, 374 N.E.2d at 266. After entertaining successive divorce petitions from the husband, the Tennessee court held him in contempt and barred him from requesting an absolute grant of divorce. *Id.* at 25, 374 N.E.2d at 266. Subsequently, the husband filed a dissolution of marriage petition in the Indiana trial court and, in response, the wife urged the trial court to defer to the Tennessee court. *Id.* However, the Indiana court refused to defer and, eventually, the Tennessee court issued a restraining order barring the husband from "pursuing a dissolution of marriage in any other jurisdiction, particularly Indiana." *Id.* at 26, 374 N.E.2d at 266. After discussing principles of comity and full faith and credit, the *Abney* court held that the Indiana court was not required to honor the Tennessee anti-suit injunction. *Id.* at 30, 374 N.E.2d at 269.

---

7. The parties represent in their briefs that the Maryland trial court has since stayed the Ma- ryland Action.

More recently, in *Hoehn v. Hoehn*, 716 N.E.2d 479, 481–82 (Ind.Ct.App.1999), another panel of this Court affirmed—without discussing the principles of anti-suit injunctions—the trial court's order restraining the respondent in a divorce action from proceeding with the litigation that he had initiated in a Georgia court. There, although the parties had been divorced in Georgia, the trial court found that Indiana has exclusive and continuing jurisdiction over the parties, pursuant to Indiana Code Section 31–18–6–11(d), because it had modified the Georgia child support order.[8] The *Hoehn* court also found that the respondent was estopped from arguing that the trial court did not have personal jurisdiction over him because he sought affirmative relief in the Indiana court on several occasions and failed to appeal an adverse ruling on his motion to dismiss for lack of personal jurisdiction. *Id.* at 483.

Although these Indiana precedents are instructive, they do not squarely address the issue before us, nor do they delineate the appropriate standard of appellate review for anti-suit injunctions. However, we find guidance in the doctrine of comity, the policies underlying anti-suit injunctions, and the other jurisdictions that have addressed the issuance of such injunctions.

It is axiomatic that state courts have the power to enjoin litigation in sister state courts under the doctrine of comity. James P. George, *Parallel Litigation*, 51 BAYLOR L.REV. 769, 781 (1999) (citing *Christensen v. Integrity Ins. Co.*, 719 S.W.2d 161, 163 (Tex.1986)). Indeed, under principles of comity, Indiana courts may respect final decisions of sister courts as well as proceedings pending in those courts. *See George S. May Int'l Co. v.*

*King*, 629 N.E.2d 257, 260 (Ind.Ct.App. 1994), *reh'g denied, trans. denied.* However, comity is not a constitutional requirement to give full faith and credit to the law of a sister state, but it is a rule of convenience and courtesy. *Am. Economy Ins. Co. v. Felts*, 759 N.E.2d 649, 660 (Ind.Ct. App.2001). The doctrine of judicial comity represents a willingness to grant a privilege, not as a matter of right, but out of deference and good will. Its primary value is to promote uniformity of decision by discouraging repeated litigation of the same question. *State of Fla. ex rel. O'Malley v. Dep't of Ins.*, 155 Ind.App. 168, 176–77, 291 N.E.2d 907, 912 (1973).

Most of our sister jurisdictions that have confronted the issuance of anti-suit injunctions follow a somewhat restrictive approach in granting such injunctions, i.e., an approach that places a premium on preserving international comity. Under this approach, anti-suit injunctions are appropriate in four instances: (1) to address a threat to the court's jurisdiction; (2) to prevent the evasion of important public policy; (3) to prevent a multiplicity of suits; or (4) to protect a party from vexatious or harassing litigation. *Golden Rule Ins. Co. v. Harper*, 925 S.W.2d 649, 651 (Tex.1996) (citing *Gannon v. Payne*, 706 S.W.2d 304, 307 (Tex.1986)), *reh'g overruled; see also University of Tex. v. Morris*, 162 Tex. 60, 344 S.W.2d 426, 428 (1961) (holding that a district or trial court "having jurisdiction of the parties and the subject matter may enjoin a party from prosecuting a cause of action in another court when such relief is necessary to prevent a multiplicity of suits, avoid vexatious litigation, or prohibit the use of the judicial processes for purposes of harassment"), *cert. denied*, 366 U.S. 973, 81 S.Ct. 1940, 6

---

8. Indiana Code Section 31–18–6–11(d) provides that: "Upon the modification of a child support order issued in another state, an Indiana tribunal becomes the tribunal of continuing, exclusive jurisdiction."

L.Ed.2d 1262 (1961). These jurisdictions caution that anti-suit injunctions should be used sparingly and granted only with care and great restraint because their exercise represents an indirect challenge to the dignity and authority of that tribunal. *Pfaff v. Chrysler Corp.*, 155 Ill.2d 35, 43, 182 Ill.Dec. 627, 610 N.E.2d 51, 55 (1992); *Gannon*, 706 S.W.2d at 306.

By contrast, other jurisdictions—i.e., some federal circuits—issue anti-suit injunctions more liberally. These courts place less importance on the doctrine of comity and, instead, focus upon whether the duplicative litigation is vexatious. *See, e.g., Seattle Totems Hockey Club, Inc. v. National Hockey League*, 652 F.2d 852, 856 (9th Cir.1981), *cert. denied*, 457 U.S. 1105, 102 S.Ct. 2902, 73 L.Ed.2d 1313 (1982); *Kirby v. Norfolk Southern Railway Company*, 71 F.Supp.2d 1363, 1367 (N.D.Ga.1999). In these jurisdictions, a duplication of the parties and issues, alone, generally suffices to justify issuing an anti-suit injunction. *Seattle Totems*, 652 F.2d at 856.

■■■ Against this backdrop, we now consider Cloverleaf's argument that the Indiana trial court erred by granting Centaur's petition for anti-suit injunction. In so doing, we find the rationale behind the restrictive approach to be very persuasive and in keeping with our Indiana precedents, which hold that Indiana courts have the power to restrain persons within the control of their process from the prosecution of suits in other states or in foreign countries, *when the prosecution of such suits in such jurisdictions is contrary to equity and good conscience. See, e.g., Kern*, 204 Ind. at 600, 185 N.E. at 447. In fact, we agree with other jurisdictions that an anti-suit injunction is the most controversial of the remedies for parallel litigation because, even though the injunction is against the party, not against the sister state, it interferes with another court's power, often in another state or country. *Id.* Accordingly, in determining the appropriate standard of appellate review, we note that the standard of review for the grant or denial of a request for an injunction, including an anti-suit injunction, is abuse of discretion. *Ind. Family & Soc. Servs. Admin. v. Walgreen Co.*, 769 N.E.2d 158, 161 (Ind.2002) (discussing preliminary injunctions). In determining whether to grant a preliminary injunction, the trial court is required to make special findings of fact and state its conclusions thereon. *Barlow v. Sipes*, 744 N.E.2d 1, 5 (Ind.Ct. App.2001) (citing Ind. Trial Rule 52(A)), *trans. denied.* When findings and conclusions are made, we must determine if the trial court's findings support the judgment. *Id.* We will reverse the trial court's judgment only when it is clearly erroneous. *Id.* Findings of fact are clearly erroneous when the record lacks evidence or reasonable inferences from the evidence to support them. *Id.* A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *CSX Transp., Inc. v. Rabold*, 691 N.E.2d 1275, 1277 (Ind.Ct. App.1998), *trans. denied.* We consider the evidence only in the light most favorable to the judgment and liberally construe findings in favor of the judgment. *Barlow*, 744 N.E.2d at 5. Moreover, "[t]he power to issue a preliminary injunction should be used sparingly, and such relief should not be granted except in rare instances in which the law and facts are clearly within the moving party's favor." *Id.*

■■■ In addition, to obtain a preliminary injunction, the moving party has the burden of showing by a preponderance of the evidence that:

(1) [movant's] remedies at law were inadequate, thus causing irreparable

harm pending resolution of the substantive action;

(2) it had at least a reasonable likelihood of success at trial by establishing a prima facie case;

(3) its threatened injury outweighed the potential harm to appellant resulting from the granting of an injunction; and

(4) the public interest would not be disserved.

*Robert's Hair Designers, Inc. v. Pearson,* 780 N.E.2d 858, 863 (Ind.Ct.App.2002) (*quoting Walgreen,* 769 N.E.2d at 161). The movant must prove each of these requirements to obtain a preliminary injunction. *Pearson,* 780 N.E.2d at 863.

Once the threshold requirements for a preliminary injunction have been met, an anti-suit injunction is appropriate only in circumstances where the foreign litigation would: (1) threaten the issuing court's in rem or quasi in rem jurisdiction; (2) frustrate a policy of the forum issuing the injunction; (3) prevent a multiplicity of suits; and (4) be vexatious or oppressive. *See Seattle Totems,* 652 F.2d at 855. Additional factors that the trial court may consider include whether separate adjudications could result in inconsistent rulings or a "race to judgment," and whether "adjudicating the issue in two separate actions is likely to result in unnecessary delay and substantial inconvenience and expense to the parties and witnesses." *Id.* at 856.

In the present case, the Indiana trial court enjoined Cloverleaf from pursuing the declaratory action that it had filed in the Maryland Action. In so doing, the trial court found, in pertinent part, that: (1) Cloverleaf's continued prosecution of the Maryland Action will cause Centaur irreparable harm through the needless hardship, inconvenience, and expense of having to litigate the Agreement in two different jurisdictions and, therefore, there is no adequate remedy at law for such injury; (2) Centaur has established a reasonable likelihood of success on the merits because the three administrative actions filed by Centaur constitute pending challenges under the Agreement; (3) the harm to Centaur if the injunction is denied outweighs the risk of harm to Cloverleaf if such injunction is granted; and (4) the injunction does not disserve the public interest.

However, our review of the record reveals that the only injury, irreparable or otherwise, that Centaur may suffer if Cloverleaf is allowed to pursue the Maryland Action is economic in nature and, as such, does not merit injunctive relief. *See Walgreen,* 769 N.E.2d at 162 (holding that a party suffering "mere economic injury is not entitled to injunctive relief because damages are sufficient to make the party whole"). Should Cloverleaf be allowed to prosecute the Maryland Action, for example, Centaur will be forced to expend the resources necessary to participate in such Action. However, such expenses will be purely economic in nature. In addition, Centaur may not demonstrate irreparable harm merely by suggesting that the Maryland Action may proceed to a judgment sooner than the Indiana Action and, thus, be entitled to full faith and credit by the Indiana trial court. Rather, to prove irreparable harm, Centaur must show that the Maryland court is biased or likely to misconstrue the governing law at issue— i.e., Maryland law.

Our review of the evidence further demonstrates that Centaur has failed to prove that its harm, if the injunction is denied, outweighs the risk of harm to Cloverleaf if such injunction is granted. This failure of proof is especially acute where the underlying dispute involves a Maryland limited

liability company and corporation, Maryland real estate, Maryland law, and the Maryland racing commission. Finally, we cannot say that the anti-suit injunction in this case has served the public interest. Accordingly, the Indiana trial court abused its discretion by granting the anti-suit injunction in favor of Centaur.

Moreover, we note that, here, many factors favor the denial of Centaur's petition for the anti-suit injunction. Specifically, the Maryland Action at issue does not threaten Indiana's jurisdiction nor does it frustrate Indiana policy. To the contrary, apart from the ties to Indiana through Centaur's parent corporation, the Maryland Action involves Maryland citizens, real estate, and law, and does not infringe in any way upon Indiana's jurisdiction or public policy to protect its citizens. In addition, other than Centaur's bald assertions,[9] there has been no showing that Cloverleaf's pursuit of the Maryland Action was vexatious or oppressive. Further, Centaur has failed to demonstrate that the anti-suit injunction was necessary to prevent a multiplicity of suits. Indeed, the Texas Supreme Court has observed that a single parallel proceeding in a foreign forum does not constitute a "multiplicity of suits." *Harper*, 925 S.W.2d at 651.

For the foregoing reasons, we reverse the trial court's grant of the anti-suit injunction. Reversed.

SHARPNACK, J., and MAY, J., concur.

---

9. In its appellee's brief, Centaur maintains that Cloverleaf "trie[d] to derail the Indiana lawsuit" by: (1) filing a motion for change of judge; (2) attempting to remove the cause to federal court; and (3) delaying in responding to discovery requests. Appellee's Br. at 7–8.